## No. 142.

### HEMPHILL, HAMLIN & CO. *v*. MAX. BRAUN.

1. The fixing by the judge *a quo* of a wrong day of return, is not a fault imputable to appellants; nor is the case affected by the fact that the motion for appeal is in the handwriting of appellants' counsel, and the erroneous return day is suggested in such motion.

2. A judgment or order refusing a new trial does not require signature by the judge.

3. Where the bond is for the amount fixed by the court, the appeal will not be dismissed, even if filed too late for a suspensive appeal.

4. Insolvent laws are for the double purpose of relieving honest debtors, and of ensuring justice to creditors.

5. The power of the States, in the absence of national legislation, to enact and enforce such laws, is no longer questionable.

6. The non-resident creditor can claim no greater rights than the resident, when he invokes the resident jurisdiction.

7. There can be no *vested right* in any particular form of remedy; and the States have under their control the remedies 'which are to be invoked within their own courts.

8. The law dissolving pending attachments, in cases of insolvency, must be enforced against a non-resident who has sued in the courts of the State.

9. He cannot, however, be forced to cumulate his suit with the proceedings in insolvency.

*Appeal from Civil District Court, Division A. Tissot, Judge.*

*E. H. Farrar* for plaintiffs, appellants.

*Braughn, Buck & Dinkelspeil* for defendant.

## ON MOTION TO DISMISS.

ROGERS, J.—The judges of the district court, when granting orders of appeal, in fixing return days should be governed by the rules of this court; but the fact that a judge, in fixing a return day, as in the matter before us, passes the earliest day upon which a return should be made, and fixes a subsequent one, fault will not be imputed to the appellant, unless the facts are so brought to the attention of the court, that it can be properly ascertained and determined whether the order of court granting the appeal resulted from an error or fault attributable to appellant. The fact that the motion is in the handwriting of counsel, and the day of return written in the motion by counsel, is nevertheless an order of court when granted, and is the act of the judge. 31 La. An. 595, and dissenting opinion of Fenner, J.; 32 La. An. 696.

A judgment refusing a new trial does not require the signature of the judge. No appeal will lie from such judgment. Therefore, when a judge, after refusing an application for a new trial, at once signs a judgment, the delays for appeal commence to run from such signing.

The judgment in this case was signed on May 7th. The motion for appeal was in time, but the bond, which was filed on the 23d, could not suspend execution of the judge. The amount of bond herein, however, having been fixed by the judge, and furnished by appellants, the appeal will not be dismissed.

The bond declares the appeal is taken from a final judgment rendered in the Civil District Court in the matter of Hemphill, Hamlin & Co. v. Max. Braun, against the plaintiffs. There can no dispute arise on this: the description is sufficient to permit a recovery.

Motion overruled.

## ON THE MERITS.

Plaintiffs, residents of the State of New York, creditors of defendant, holding the notes of the latter, brought this suit for the recovery of the debt, obtaining a writ of attachment, by virtue of which the sheriff seized certain property. After the issuance of the writ, and pending the seizure, the debtor made a voluntary surrender of his property, under the insolvent laws of this State. The syndic of the insolvency proceeded by rule against plaintiffs for a stay of proceedings in this suit, for the release to him of the property attached, and for the cumulation of this case with the insolvency proceedings of Max. Braun. The plaintiffs resisted, on the ground that, being non-residents, the insolvency laws of this State could not affect them; that their attachment could not be disturbed, nor their proceedings stayed, or in any wise interfered with, by reason of any order rendered in said insolvency.

ROGERS, J., after stating pleadings and facts :—These notes are dated in 1879. The congress of the United States, in 1878, had repealed the general bankrupt law, and the insolvent laws of this State, which had for more than ten years been suspended, revived. From the date of the notes until their maturity—to the instant of this suit—no change had been made in the laws of this State, which impaired either the rights of plantiffs, or remedies to secure those rights.

Insolvent laws were enacted for the humane purpose of protecting honest but unfortunate debtors;—"conceived as much in a spirit of mercy to the debtor, as of justice towards the creditors." Plympton v. Preston, 4 La. An. 356.

And the power of the States to enact such laws, and to enforce them among their own citizens, is no longer to be considered as questionable. 4 Wheaton 122 (419), Sturgis v. Crowinshield; 12 Wheaton 213, Ogden v. Saunders.

And the fullest consideration has been given the subject, in all its phases, by the highest judicial tribunals of the country, and nothing, it may be said, is left to conjecture.

In the present case we are not called upon to determine whether plaintiffs have the right to insist on the fulfilment of their agreements with defendant, and to proceed to judgment. We are only to determine whether they have a right to pursue the remedies invoked by them in the proceedings taken before one of the tribunals of this State—called upon to administer the estate of a debtor for the benefit of all his creditors, a part of which estate had been attached on the complaint of this only ordinary and non-resident creditor, on the grounds of an alleged attempt at unfair dealing, in favor of preferred parties, to the injury of all other creditors, including plaintiffs.

At best, a non-resident creditor can claim no greater right than a resident, when he invokes the aid of the resident jurisdiction; and the remedies which this State extends to all, foreign and native alike, are no more sacred in defence of the one than the other before her own forum.

We are called upon to determine the effect of a proceeding which simply works a modification of a remedy claimed by a creditor in executing a contract made in this State, and sought to be executed in this State. The plaintiffs claim no privilege or preference over other creditors, nor to or upon any of the insolvent's effects; and, in fact, they have none. The laws of Louisiana authorizing the *cessio bonorum* have existed, as it is now understood, since 1817, long before the contract evidenced by the obligation in this case was made.

The remedy by attachment, urged by plaintiffs, was not a part of their contract. It is true that the law of attachment, ·as invoked, existed when they received the notes. It is also true that at the same time, and by virtue of the same sovereign ·authority, existed a law to which the courts of the State are bound to give effect; and that law provided, as a modification to one of the remedies given to enforce a contract, a cession by a debtor, which, by a stay of proceedings, suspends action, ·and protects him when unfortunate and harrassed, and when ·it is evident his creditors can receive no benefits from vexatious process.

Cooley on Constitutional Limitations, page 360, correctly declares: " The right to a particular remedy is not a vested right (the exception when the remedy is a part of the right itself). As a general rule, every State has complete control ·over the remedies which it shall afford to parties in its own courts. * * Any rule or regulation in regard to the remedy, which does not, under pretence of regulating it, impair the right itself, cannot be regarded as beyond the proper province of legislation."

These conclusions result from the adjudications of all courts, State and federal. We have no doubt of their application to the cause now under consideration.

The judgment is affirmed—except so far, however, as it orders a cumulation of plaintiff's suit with the insolvent proceedings. We do not consider the court is authorized to direct the manner in which plaintiff shall preserve or prosecute his rights, such as he may have. Appellant paying costs.

## CONCURRING OPINION.

McGLOIN, J.—I fully agree with my ·learned colleague in the position he assumes in disposing of this cause. It is now conceded that, in absence of national bankrupt legislation, the States have authority to adopt insolvency laws, for the purpose ·of distributing the assets of a broken debtor; and, in consid-ration of an honest surrender, granting him a discharge. The

only questions which may possibly be in controversy—if even these be so—relate to the effect of such discharge against contracts not born within the limits of the State which grants the same, and against persons who, as non-residents, are to a certain extent beyond its jurisdiction.

If a State has the right, under any circumstances, to enact statutes of this character, they have, necessarily, the power to do all that is essential to carrying out the purposes of such statutes—of course, subject to the restrictions of the fundamental law. One of the principal objects of all legislation of this character is the fair distribution of the assets of the disabled debtor amongst his creditors. Certainly, to accomplish this, there must be provision for the judicial possession and partition of such assets. If one creditor, simply because he is a non-resident, may take or withhold any one piece of the insolvent's property, not specially affected in his behalf, and which, being within the State, is subject to its laws and to the jurisdiction of its courts, he may, under appropriate circumstances, take or withhold it all—defeating the operation of the statute, in one case partially, and in the other totally. This certainly would be the effect of holding, as we are expected by appellants to do, that, if a non-resident creditor is not subject to the insolvency laws of the State, his right to proceed against the property of his debtor, pending the *cessio bonorum*, cannot be restricted or destroyed. Assuredly, under such a view, a non-resident creditor would possess rights even more than sovereign in their nature. He could come within the boundaries of a State, and place himself above its sovereignty, and beyond its laws, although the latter be such as the State has an undoubted authority to enact. He could come into the courts of that State, and practically arrest the progress of its judicial procedure, in so far as his own interest required such arrestation. He could seize upon privileges which were lawfully denied a citizen of the State itself: so that, for the stranger there would be one and a higher law, and for the denizen another.

If, under these views, a non resident creditor cannot withdraw, by attachment, assets already surrendered by an insolvent, neither can he, by virtue of such a writ, withhold such property from legal custody, even though the writ issued before the *cessio bonorum.* It can scarcely be contended that any particular form of judicial remedy enters into a contract, so as to make such special remedy a portion of such contract; and, therefore, as to it, preserved from alteration or withdrawal by the provisions of the federal constitution prohibiting the impairment of the obligation of contracts, and the divestiture of vested rights. The regulation of its own form of judicial procedure is a prerogative of the sovereignty of each State, of which the fundamental law of the nation has not deprived it, and which such fundamental law could never intend to place under the absolute control of individual citizens. There are matters which are above the plane of private contract; and this is of the number. Smooth and harmonious action in the courts is essential to the fair and speedy administration of universal, or rather general, justice; and without uniformity and system, such harmony and smoothness cannot be secured. If every man might stipulate for some particular form of remedy, and call upon the tribunal of the law to issue its citations, grant its hearings, and execute its decrees in such manner as he may have chosen to dictate, judicial chaos could not long be held at bay.

Therefore it is, that, as a matter of imperative necessity, these things are left to the control of the States; and the provisions of the federal constitution, already referred to, have been held to impose no obligation upon these commonwealths, beyond that of furnishing a remedy of some nature, reasonably sufficient for the protection and enforcement of contract and other rights.

The writ of attachment, and others similar, are exceptional in their nature, and merely preliminary. They are by no means essential to the enforcement of legal rights. They are accorded in some cases, and refused in others; and if they be

of *absolute* necessity in some instances, they should be equally so in all.  So, if the creditor to whom they are denied, and who has therefore only his ordinary process, has yet what must be considered an adequate remedy, it follows that one who, under special statutes, is more favored, still has his sufficient remedy remaining, if, for any cause, the legislature subsequently withdraws the exceptional rights, and reduces him to a level with ordinary creditors.

But it is well settled, that, so far as possible, all of the statutes of a State must be construed so as to harmonize, in order that all may be upheld.  If the non-resident creditor, in this case, has obtained a writ of attachment, he did so by virtue alone of the law of this State to the case applicable.  That law is no more solemn or operative than other statutes which allow an insolvent to apply to the courts, and require such courts to possess and distribute all his property.  The latter modifies the former, and the writ, when issued, is subject to contingencies rendered possible by the latter.  To maintain appellants' position would be to allow them to sunder the legislation of this State—accepting and profiting by one portion, and repudiating another equally constitutional.  It would be to allow them to exercise, not the remedy actually created by the laws of Louisiana, but one larger and more peremptory.

The principle here contended for has received the sanction of our learned brothers presiding over the Circuit Court of Appeals for the first circuit of this State, in the case of August, Bernheim & Bauer *v.* Brown, 1 McGloin 261.

Thus far the judges of this court have gone together; and thus far, alone, perchance, it is necessary to go in the determination of this cause; and beyond this I have not solicited my learned colleague to accompany me.  But, as I have had occasion to cite the case from the first circuit, which is in opposition to the opinion announced by the Supreme Court of the State, in Orr & Lindsley *v.* Lisso & Scheen, 33 La. An. 476; and as the issues in August, Bernheim & Bauer *v.* Brown, and those of the controversy we are now disposing of, are alike, not only upon the

points touched in the opinion of my learned colleague, but in
other respects as well, I deem it necessary and proper to state,
individually, that I do not approve of the doctrine laid down in
the case at 1 McGloin 261, any further than it goes to uphold
the particular proposition in support whereof it has been cited.

Under such circumstances, courtesy towards my learned
brothers of the first circuit may, perchance, require me to state
why I wish to guard against the possibility of placing this
court in the attitude of an implied acceptance, in full, of
August, Bernheim & Bauer v. Brown.

It is the misfortune of human legislation, that it is too often
compelled, not so much to make choice between irreconcilable
benefits or advantages, as to mark the course which, of neces-
sity, lies between opposing dangers. Human foresight is so
limited, and the power and latitude of change is so infinite,
that the remote peril of to-day may become the proximate one
of to-morrow : and what was the wisdom of the past may be
the folly of the present. In the instance under consideration,
the framers of the federal constitution had to navigate, as best
they could, between the dangers of unbridled sovereignty,
with the possible disregard and subversion of individual right
upon the one hand, and the undue crippling of governmental
power on the other, with a corresponding restriction of its
ability to further or protect the general welfare. They seem,
indeed, to have weighed with honest care every word that went
to build up this portion of the fundamental law of the nation.

In the particular connection now under consideration, the
prohibition to the States is against passing laws impairing the
*obligation of contracts*. It is pretty well determined, by judi-
cial construction, that the *obligation* here referred to is that of
the civil or municipal law, whether express or implied, whereby
such law recognizes and enforces the moral obligation that
attaches to every contract innocent in its nature. This is
reasonable, for the obligation of a contract is only a portion of
it, or, perhaps more properly, a result; and the clause in ques-
tion, by restricting itself to the *obligation* alone, compels us to

seek diligently the exact meaning of the word. It may apply, as used, to the natural or the legal obligation, or to both. The natural obligation of a contract is founded upon the immutable principles of right, and is independent of human legislation. No tyranny of mere human legislation can reach it; for if one man stands bound in conscience to another, all the statutes that might be enacted to the end of time, cannot shake or destroy such right upon the one hand, and the duty upon the other. Human laws, therefore, in attempting, in this respect, to strengthen the divine, would be concerning themselves with what was vain; and doing a thing which would advance no interest of humanity. It is not, therefore, to be supposed that the men of experience and deep wisdom, who framed the constitution of the United States, would engage themselves upon shadows such as this.

The legal obligation, however, is the means given by human law, to the individual, to enforce his rights. It is the lending of the power of the government to the citizen, to aid him in the accomplishment of that which, in a state of nature, he would have to bring about by his own force or cunning. As, in the interests of society, the individual cedes to the State this right of personal compulsion against his debtor, the State, on its side, owes him a fair and efficient substitute. This, of course, the State must regulate and govern; but it cannot be justly denied to any one. In this connection it is, therefore, that the citizen must feel the tyranny of the State; and here was something in connection with which it might be unwise to leave the subordinate commonwealths with untrammeled powers. This was the only *obligation* that it was in the power of the framers of the federal constitution to foster or protect; and this, it cannot be doubted, was the only one with which they concerned themselves.

The special language of this provision shows that at the time it was constructed, or chosen, the danger of an undue interference with the sovereign powers of the States was recognized, and that there was the purpose to trammel it as little

.as possible, consistent with the accomplishment of the particular end in view. The dominion of the sovereign power over the question of contract must necessarily be wide. All persons cannot safely be trusted to contract; hence minors, interdicts and married women are placed under restrictions. Though it be a matter of consent, every meeting of minds should not create a contract, else men might suffer grievously through error, force or fraud; or the unconscionable taking advantage of particular circumstances, as the extortion of usurious interest, or the exaction of a man's watch, his horse, or his house and lands, for the morsel that keeps him from starvation. All matters cannot be made the subject matter of a contract, as where men agree to do an illegal or otherwise wrongful act, or to dispose of their personal liberty, or to waive homestead or other rights of similar character. Every completed contract, even, should not be permitted to stand, as where one purchases property subject to concealed redhibitory vices, or leases a house for a term, which is subsequently, to any serious extent, impaired in its usefulness. Some agreements must be placed beyond the reach of perjuries, or freed from the uncertainties of verbal convention; hence stipulations of such character must be in writing, or even, in cases, by public act.

The States, as a matter of course, are charged with the determination of these questions, as matters of public policy; and the national constitution would have been treading upon dangerous ground had it attempted, in this regard, to control their powers. It has not, however, so attempted, for it does not apply its language at all to the contract, but simply to its *obligation*. Of course, until there is a *contract* there can be no *obligation*, in this connection. As it is the legitimate province of the sovereign to define what shall constitute a contract, to declare upon what terms and conditions one may spring into being and continue its existence, and as the States never surrendered this prerogative to the general government, it remains with the States, unimpaired.

The language of the constitution practically says to the

States : Regulate the matter of contract as you please ; say what shall be a contract, and what not; how it shall be brought into being, how maintain its existence, and how be extinguished: but, when once that which you permit to be considered a contract has been ushered into life, you shall not take from its beneficiary all means of its enforcement. Therefore it is that this clause of the fundamental law of the nation, and that against the divestiture of vested rights, do not restrict the power of State legislation in this regard; they only preserve existing contracts from injury or destruction. From the moment statutes affecting these matters become a portion of the law of the State, nothing violative of them can become a contract, as contemplated by the constitution ; neither can it *vest*, within the intendment of that instrument, any *rights* in one who attempts to violate the law.

If this reasoning be correct, it would seem to me clear, that the legislature of the State, if within its own constitution, may declare to its citizens : you are permitted to contract, and your debtor shall be bound to you in person and effects, or in property alone, or in some designated portion only of his property. This principle justifies laws shielding the person of the debtor from civil arrest; and homestead and other exemption laws. So the State may also dictate for the future, that a lawful obligation shall, as it were, die of old age, and fix the period of its life ; hence, laws of prescription or limitation. Hence, also, as between citizens of the same State, insolvency laws have been generally conceded to be operative.

While following thus far the current of opinion upon these questions, I here must pause, and ask why, in this last connection, there should be a distinction between the citizen and the non-citizen ? If the public policy of a State demands an insolvent law, why may not the stranger, coming within the State to invoke its laws, be subject to such a statute of bankruptcy, as well as its own people ?

It may be well, before proceeding further, to touch briefly

upon the nature and effect of these insolvent laws. There is in them intrinsically nothing that is tyrannical or unjust. On the contrary, I consider them exalted in purpose and in results. They are merciful to the debtor, and at the same time ordinarily beneficent to the creditor. They are as well advantageous, and often essential to the well-being of society itself. Commerce, with its ramified connections, its wide-spread systems of credit, and its alternations of inflation and stringency, keeps bankruptcy, as it were, constantly impending over the heads of its votaries. The manufacturer, common carrier, and the planter or farmer, are likewise in perpetual danger of insolvency. Of course, when any of these fail, capital, credit, etc., are gone; but an indebtedness which, even with these lost advantages, it was impossible to carry, remains to bear down the debtor. To such an unfortunate one, even if relieved of his obligations, the task of his own re-establishment is one of extreme difficulty. Permit the load to remain upon him, and it becomes one almost of impossibility. It is, therefore, a mercy, and one which can ordinarily work no real injury to creditors, to lift from the shoulders of such men the incubus of a mass of debt, which, in all probability they will never be able to pay; thus enabling them to start out once more with a reasonable prospect of success upon the road to competence.

Where a State does this for the broken debtor, it preserves a citizen, not entirely bereft of all power of advancement, and one who is impelled, by a reasonable hope, to further efforts; remaining thus a contributor to the national wealth, instead of a mere consumer. Where, however, it denies this relief to its disabled ones, it leaves them with spirits crushed, and without power to rise again into the ranks of those who, while furthering their private interests, are also increasing the aggregate of the nation's wealth, building up its commercial, agricultural or manufacturing interests, as the case may be, and raising the standard of its influence and power.

Furthermore, there are great calamities, such as war, invasion and the like, which befall a country and reduce it to bank-

ruptcy, or its very verge. They pass away eventually, but the property of the people is gone, or greatly diminished, while their debts remain intact. Shall a nation, under such circumstances, permit the mass of its citizens to remain despondent and in lasting insolvency? Shall it have no power to impose upon the creditor class, its fair proportion of the general loss; and extend to all that served or suffered in the hour of need, the opportunity, at least of starting again fresh and free?

Finally, when men become embarrassed, creditors too often engage, as it were, in a trial of speed, to appropriate, each to himself, the assets, and overwhelm the debtor with the heavy law-charges and other injuries of accumulating seizures. The result, in the absence of insolvent laws, ordinarily, is that one or more of the debt-holders is paid in full, with heavy judicial expenses, while the remaining creditors receive nothing, having left to them only barren demands against a broken debtor, who, in all probability, will never again possess property to seize. Bankrupt laws check such ruinous contests of celerity, take from the debtor all the property he possesses and distributes it fairly among all the creditors. In consideration of the debtor's honest disclosure and surrender of all his assets, of the withdrawal from him of control over his own affairs, and the assumption of his rights and duties as to present property, towards all his creditors, the law grants such debtor a discharge from his obligations. Surely such legislation is not unilateral, but advantageous to creditor and debtor alike, and consequently in the interest of both.

For these reasons, civilized nations have always claimed and exercised the right of enacting insolvency laws; and most of them give to such legislation a permanent place upon their statute books. Moreover, such nations not only protect their discharged debtors against creditors that are their own subjects, but so long as such debtors remain at home, they shield them from the pursuit of aliens as well. What subject of Great Britain would dream of appearing in a French Court to prosecute a citizen of France, after the discharge of the latter

under the laws of the French Republic? So, what court of this country would enforce a British claim against an American citizen, discharged under the bankrupt laws of the United States, when such laws were in force?

The States of this Union ·are in all respects, where their powers are not restricted by fundamental law, as sovereign as any of the nations of Europe or of the world. What any of the latter may lawfully do, this any American State, under the restriction mentioned, may likewise do. It is conceded that the federal constitution does not deprive the States of the power to enact insolvent laws, so far as they affect contracts of the future. If, therefore, they have this sovereign power remaining to them, how does it happen that this power is one thing when exercised by a State, and another when exercised by the general government of the United States, or by the other governments of the world? If the State of Louisiana cannot, by its laws of this nature, affect the claims of a citizen of New York, because the latter is in person without its territory, how does France strike the debt due a resident of London, or the United States one that is due a person dwelling in Paris? When it is argued that the New Yorker may attack his Louisiana debtor, not alone if such debtor be found in person or property within the State·of New York, or of Ohio, but within the State of Louisiana itself; is it not argued as well, that the Londoner should be similarly heard in Paris, or the Parisian in America?

I am not prepared to assent, on general principles, to the doctrine, that the laws of a country enter of themselves into the contracts of its people, as in the nature of implied stipulations. They are enactments for the determination of the rights of parties, where the latter have been either silent or ambiguous. They hold their course of their own vigor, and independent of individual consent. It is true, persons may be satisfied with the dispositions of the law and remain silent; but, under such circumstances they have not contracted, and they are not held or benefited by reason of any assent, express

or implied, but by reason alone of the law's will. There has been no *aggregatio mentium*, properly speaking, and none was needed. Be this, however, as it may, it is nevertheless certain that the statutes of one State, as applicable to contracts, connot, *of right*, follow the contract beyond its borders, and impose themselves *nolens volens* upon the legislature or courts of another jurisdiction. The principles of courtesy may *permit* this, and possibly do in most cases ; but it is so only when the extraneous law is not in antagonism with the home legislation. The statutes of limitation of liens, exemption and insolvency laws, are all illustrations of this principle.

Particularly clear is it, that even within the State itself, its laws of the remedy do not enter into the conventions of its citizens ; and equally certain, that a contract, passing beyond the bounds of its own State, to seek enforcement, carries with it none of the remedies, as such, of the State of its origin. However the case may be, as to its validity and interpretation its enforcement must depend entirely upon the law of the community to whose courts the appeal is made in its behalf. The clause of the federal constitution, against the impairment of the obligations of contracts, does not compel a State to afford the citizens of any other State, all the rights, or any of the remedies peculiar to such other State. All that can be required of any State, is to accord to the stranger the same rights and remedies that it has provdied for its own people. Even if, by reason of his non-residence, a creditor is beyond the jurisdiction of a particular State, when he comes within its limits, to invoke the aid of its laws for the enforcement of his obligation, he must take those laws as he finds them. If they do not permit the arrest of the debtor, or the seizure of all his property, the fact that the statutes of his own State accord such remedies is of no service to him. Indeed, under the idea of fostering a high sense of individual honesty, or to abolish the system of credits, it is possible that a State might restrict its courts simply to the task of interpreting laws and contracts, or of debts, money disputes, and refuse them all power of com-

pelling payments or compliances. If such legislation were binding upon its own citizens, how should a stranger who, for his own purposes, introduces himself or his interests within its jurisdiction, escape its binding force?

Coming more closely to the case under discussion, the State of Louisiana does not permit the unrestricted appropriation of the debtor's property to the satisfaction of his obligations. It has its exemption laws and its laws of homestead. It goes further, and says to the creditor, " You may seize the property of the debtor, so long as he has not arrived at the condition of incapacity to satisfy all his debts, and has not, in the interest of all concerned and of the State itself, surrendered all his assets to the courts for lawful distribution. When such contingency, however, has arisen, the writ of *fieri facias* is no longer at your command; and your sole remedy is to demand and receive your share of the fund realized from the surrendered assets." Thus Louisiana attaches a condition to its laws of the remedy one admitted to be of force against its own citizens, and one which should govern the non-resident as well, so soon as he introduces himself, or his contract, within the jurisdiction of the State. To allow a stranger to come into the courts of Louisiana, and issue his *fieri facias*, or similar writ, even after a *cessio bonorum* and discharge, is to administer a remedy unknown to the laws of the State, and even in direct antagonism thereto. It is to hold the property of the debtor, where a sovereign State has said, in advance of the action, and for universal application, that it shall not be held.

I, therefore, must say that I do not see the force of the contention, as applicable here, that the laws of Louisiana cannot extend beyond its own limits to affect the contracts of other States. It is not attempted by legislation of the character in question to give her laws an extra-terratorial application. So long as circumstances keep such contracts, and the interests they involve, beyond the boundaries of this State, the laws thereof do not reach it. If the extraneous creditor finds the debtor or his property outside of Louisiana, he may ignore

our laws and proceed to enforce his debt. But, within the bounds of this State, the laws upon its statute-books are supreme; and if the interests of the non-resident creditor impel him to bring his contract to Louisiana for execution, it is passed at once under the dominion of the law of this State, as to its effects here, and it is concluded by it. At all events, he can only demand that laws of this State, as they are, be enforced in his favor; and to allow him to enforce them, ignoring their restrictions and exceptions, is to allow him to enforce a law which is not that of the State of Louisiana.

Furthermore, although the *person* of a non-resident be beyond the boundaries of a State or nation, any property or right he possesses within its limits is rightfully subjected to its legislation. So, any such property or rights that he may bring or send within the bounds of such State or country, passes at once under the full dominion of its laws, *past as well as future.* As to the application of this principle, no sound distinction can be drawn between property or rights which are to be seen and touched, and those which are not. The privilege of suing upon a debt, and seizing to satisfy it, constitute rights and interests as legitimately the subject of the legislation of every sovereign power, as real estate itself can be. The fact that these privileges of suit and seizure, as against a citizen, rest in an alien, does not in any manner detract from the power of a State's control over them. Of course, the effect of such legislation does not reach beyond the confines of the enacting State, to the person of the non-resident creditor, so as to affect him in other jurisdictions; but within the confines of such State, such laws are supreme. Thus, a New York creditor, although his sole interest in Louisiana may be the right to sue one of the citizens of the latter State, is bound, so far as the enforcement of his rights within the State of Louisiana are concerned, by the limitation or exemption laws its legislature may adopt, as fully as a citizen of such State would be. The position in reality is, that the law of Louisiana acts upon this right of suit, as it would upon the merchandise or real property

of an alien. It fastens upon and affects the *rem*, and controls it only so far and so long as it may be or remain within the State. It follows from this, that where a resident of one State acquires the right to sue the citizen of another in the courts of the latter, that right of suit passes at once under the dominion of the latter State, and is affected by its legislation, past and future, precisely the same as though the right had sprung into existence strictly between fellow-citizens of the same commonwealth. Therefore, I consider that the insolvent laws of a State have a similar power and authority; and to apply them to the right of suit by an alien in this State, is not to extend the influence of our laws beyond our own borders, any more than it is where we enforce our prescription or limitation laws, or those of exemption, against all litigants, wherever be their domiciles..

The objection that insolvency proceedings are in their nature judicial, requiring due notice to bind, and that one who is not present in person or property cannot be reached by the process of the courts conducting them, is closely related to the one which has just been discussed. It will not be denied that, with the rights or property of an alien within a country, its courts, as well as its legislature, have the right to deal. If a man acquires either, within the limits of a State, he thereby consents to subject them to the action of its courts, as well as of its laws; for it would be strange, as well as intolerable, if the legitimate statutes of a State, affecting particular things within its bounds, could not be enforced by its judicial tribunals, simply because the owner of those things is an alien. If a non-resident falls heir to an estate, or receives a legacy, the courts of the State in which the succession lies may entertain a suit against him, to regulate the payment, delivery, or even the validity of the bequest. If he holds a mortgage or privilege upon property in the State, which is also similarly charged in favor of a citizen, the latter may force the stranger into the courts of his State, for a judicial determination of their conflicting rights. If he has a judgment in the State against a

citizen thereof, the latter may sue him within the State for a judicial declaration of the nullity of such judgment. If he be a stockholder of any corporation within the State, he may be there impleaded in proceedings for the liquidation of such association. If he pretends to title to any property, real or personal, in the State, the true owner may cite him before the courts of such State, in an action of jactitation of title, or for a decree of nullity against his adverse title. If one who is only his ordinary agent, or an agent without authority to stand in judgment, dispossess a citizen of the State of his property, such citizen may invoke the possessory action against him, though he be not present in person or property, or by competent representative. If a citizen of the State dies, the probate court brings all the creditors in—alien or domestic—by publication, and determines their controversies and settles their rank. Illustrations of this character might be extended indefinitely, where the courts of the States should lawfully bring a non-resident before them, without citing him in person, and *without being able to seize property that belongs to him.* They take their jurisdiction as *to the rem*, which, in such cases, is the *intangible* property or right which, in justice to its own citizens, must be adjudicated upon. The fact that such rights are intangible, and so cannot be reduced to possession, cannot have the effect of exempting them from the control of the judicial tribunals of the State. If so, no estate of a deceased, and no insolvent corporation can be liquidated, so as to bind non-resident creditors. No questions of conflicting mortgages, liens, titles, or possession to, or of property can be determined, until the alien chooses himself to advance.

Upon the same principle, when a debtor falls into insolvency, and his resident creditors desire a *cessio bonorum*, or where he himself deems it advisable to provoke one, the matter presented for judicial determination, as between the creditors, is the relative rights of each in and to the assets or their proceeds, which the State has a right to regulate by its laws, and its courts to determine upon; for the only interest of the alien to

be affected, is his right to hold that same property for his debt, and that right can have no existence outside of this State, and is therefore, to all intents and purposes, within the State. It is as much so, as is the non-resident's right, inchoate until accepted, to a legacy within the State, or to his remedy against the deceased for his debt. It is as much so, as is the alien's right to enforce his judgment, lien, or title, or demand, in the future, his dividends or share of assets in an insolvent corporation.

So, on the part of the debtor, his demand against his creditors is for that protection or exemption of his future property, within this State, which the law promises in consideration of an honest disclosure and surrender upon his part. The *rem* he brings before the court, is the right of the creditor to pursue him hereafter, *within this State,* for the debts placed upon his bilan or schedule; an existent right, which can be exercised only in this State, and, therefore, properly has its *situs* within the same, and is subject to its jurisdiction. This right of the creditor to pursue and seize presents a judicial question, which the insolvency of the debtor makes vital, and gives the court authority to restrict and otherwise regulate it, as between the creditors themselves; and equally is it sufficient to support the other branch of the same process, that for the relief of the debtor. The law says to the debtor do this and you are entitled to future exemption; and the debtor complies, whereby he is entitled to be declared free. A lawful and real issue is presented, under special sanction of the law, in which a citizen of the State has a substantial interest, and it affects a *right* of the non-resident, *existent only in this State.* The law may make such right, though intangible, a proper subject of judicial controversy, as fittingly as though it were tangible property; and this it has done.

These principles are not at variance with the authority of Pennoyer *v.* Neff, 95 U. S. (5 Otto) 714; for there a *creditor* sought to proceed against his non-resident *debtor,* without personal service or levy upon his property. In that case, as in

this, a *personal* judgment against defendant could not be obtained. All that was open to the creditor, was to proceed *in rem* against the property of Pennoyer, located in Oregon. *As to that property*, the court of Oregon had jurisdiction; but it was tangible, and should have been brought before the court by seizure, and made, as it were, the defendant. The personal judgment obtained was null for want of service, and there were no proceedings *in rem* against the property. Furthermore, the litigation did not involve the status of that particular property, for the settlement of any adverse claims or titles thereto. Had, in that case, the property, instead of being real estate, been some right intangible, and had the litigation had for its object the necessary determination of the status of that intangible property, or the settlement of disputed rights or claims therein or thereupon, I do not believe the Supreme Court of the United States would have denied the jurisdiction of the lower court to entertain and determine the controversy.

The principle which is here contended for, is, in this particular connection, of universal recognition and practice in all civilized countries. The United States itself has recognized and respected it. Bankrupt proceedings, the world over, bring in the alien creditor without seizure of his property, and necessarily by constructive notice. Who has questioned the jurisdiction of the courts of the nations of Europe, to so implead aliens in such proceedings? Have not foreign and non-resident creditors been thus forced, time and again, into the bankrupt courts of the United States, and the judgment discharging the debtor been always held as obligatory within the bounds of this Union? If it is proper for such governments to authorize the impleading of foreigners in such cases, by what logic is it unlawful for the States to do the same? Are the latter not sovereigns as well as the others, and are they not to be judged by the same rules of international law?

The Holy Writ declares: "Diverse weights and diverse measures both are abominable before God." I cannot disabuse

myself of the impression that the rights of the States have, in this connection, been weighed and measured by one standard, and those of the national government and of other independent nations by another.